# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **CODY DAVIS, 923389,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **NO. 3:08-CV-1509-O** |
| | § | |
| **RICK THALER, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division** | § | |
| | § | |
| **Respondent.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b) and Special Order 3, this case was referred by the district court for findings, conclusions, and recommendation. The Findings, Conclusions, and Recommendation of the Magistrate Judge are as follows:

## I.       Procedural Background

On May 25, 2000, a jury convicted Petitioner of the capital murder of his five year-old daughter. The State did not seek the death penalty, and the trial court assessed a statutorily mandated life sentence. *State v. Davis*, No. 19720 (86th Dist. Ct., Kaufman Co., Tex., May 25, 2000); TEX. PENAL CODE ANN. § 12.31(a) (1993) (amended 2005 and 2009). The Thirteenth Court of Appeals affirmed the conviction in 2005. *Davis v. State*, No. 13-00-395-CR, 2005 WL 1492216 (Tex. App.—Corpus Christi June 23, 2005, pet. ref'd). The Texas Court of Criminal Appeals refused a petition for discretionary review and denied a motion for rehearing. *Davis v. State*, No. PD-1802-05 (Tex. Crim. App. May 17, 2006); *Davis v. State*, No. PD-1802-05 (Tex. Crim. App.

June 28, 2006).  The United States Supreme Court denied certiorari in 2007.  *Davis v. Texas*, 549 U.S. 1128 (2007).

Petitioner filed an application and a supplemental application for a writ of habeas corpus in state court, together raising 232 grounds for relief.  *Ex parte Davis*, Application and Supplement, No. 69,174-01.  (SHR 130; SHR Supp.)[1]  After remanding the writ for a paper hearing on five claims, the Texas Court of Criminal Appeals denied relief on August 20, 2008.  (SHR at cover, 90-92.)

On August 27, 2008, Petitioner filed a petition for writ of habeas corpus in the district court, which he later amended pursuant to the Magistrate Judge's order  (docs. 1, 48).  In the amended petition, Petitioner claims that, considered individually and in their totality, the following acts constituted ineffective assistance by trial counsel:

1.    eliciting false testimony favorable to the State;

2.    failing to object to the prosecutor's closing argument and voir dire;

3.    presenting closing argument that undermined Petitioner's credibility and defense theory;

4.    presenting deficient closing argument;

5.    abdicating the role of defense counsel by arguing for Petitioner's conviction of a lesser-included offense; and

6.    failing to investigate, secure, and introduce the recording of the East Texas Medical Services ("ETMS") 9-1-1 call.

Petitioner also alleges that the State failed to disclose the ETMS 9-1-1 recording in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

On June 23, 2010, Respondent filed his amended answer (doc. 50).  On July 13, 2010, Petitioner filed a traverse (doc. 53).  The Court concludes the petition should be denied.

---

[1] SHR refers to the clerk's record from the state habeas proceedings.  RR and CR refer to the reporter's record and clerk's record, respectively, at trial.

## II.    Factual Background

A.    Court of Appeals' Statement of Facts

The following factual background is taken from the opinion of the Thirteenth District Court

of Appeals.

Brenda Zepeda, the dispatch supervisor at the Kaufman Sheriff's Department, testified a 911 call came in at about 12:33 a.m.[2] on August 27, 1999. The recording of that call was played for the jury, who heard [Petitioner] tell the dispatcher he was performing CPR on his daughter and that she had fallen in the tub and hit her head. Zepeda then transferred the call to East Texas Medical Service (ETMS).

Three paramedics testified that they were dispatched to [Petitioner's] home on August 27, 1999, as a child had fallen in a bathtub and was not breathing, and CPR was being administered. Upon arrival they saw the child on the floor with no one administering CPR. [Petitioner] was speaking with a police officer at that time. The child had no pulse, no blood pressure, and was not breathing.  The paramedics testified that they saw vomit on the side of the child's cheek and mouth and numerous bruises covering her body.  They also said her rib cage felt "mushy" and appeared to be fractured, as it gave way under the pressure of administering CPR.

The paramedics observed the child's heart had some electrical activity, although it was not beating, and administered epinephrine and atropine, which stimulate the heart and increase the pulse rate.  They also inserted a breathing tube, performed CPR, and transported the victim to the hospital, where she later died.  The paramedics testified that the medical treatment administered to the child would not have caused the injuries observed on her body and that the drugs administered to her would not have caused her any harm.

Mike Williams, a sergeant for the Forney Police Department, testified that when he arrived at the scene, [Petitioner] began "simulating" CPR on the victim although he never touched her mouth. Williams moved [Petitioner] aside and began performing CPR. As he performed compressions, he felt the left side of the victim's chest "caving in."  Williams observed vomit and blood in various parts of the home.

---

[2] Evidence as to the time of the call is conflicting.  Zepeda testified that the call was received at 12:33 a.m. but after consulting the logs, she testified the call was received at 12:20:52 a.m. and transferred to ETMS at 12:21:53.  (5 RR 45, 48, 50-51.)

Brad Starkes, the captain of the Criminal Investigation Division of the Kaufman County Sheriff's Department, testified [Petitioner] was brought to the department where Starkes interviewed him after advising him of his *Miranda* rights. Starkes noticed that [Petitioner's] knuckles were red. [Petitioner] was cooperative and agreed to take a polygraph test. During the two-hour interview, [Petitioner] dictated and signed a statement in which he said that for disciplinary purposes, he had whipped the victim on her bottom, arms, legs, and hands with a red plastic pipe and hit the victim with his fist three or four times in the back and once on the side.

Robert Harris, the Sheriff of Kaufman County, testified [Petitioner] was brought to his office for the purpose of providing a second voluntary statement. After advising [Petitioner] of his *Miranda* rights, Harris took [Petitioner's] statement, which [Petitioner] read out loud and signed. In the statement, [Petitioner] said the victim was a disciplinary problem and he had no control over her. He attempted to punish the victim by using a stick to hit the victim on the buttocks and the tender part of her legs. When the victim started to struggle, [Petitioner] told her resisting would only make matters worse. He hit her in the back, stomach, sides, and neck. He also hit her on the back and sides with his closed fist. Later that night, when the victim spilled juice in the kitchen, [Petitioner] said he "completely lost it" and hit her with his fist.

Jonie McClain, the medical examiner, testified she performed the autopsy on the victim. She observed blunt force trauma injuries on the victim's chest, abdomen, and face, multiple broken ribs, as well as irregular contusions on the body consistent with being struck by a stick or pipe. She removed and dissected the victim's heart and found a laceration or tear on the septum of the heart. She testified that the victim's injuries could not have been the result of someone performing CPR on her or the result of the child falling in the bathtub, and that, in her opinion, the cause of death was trauma from multiple blunt force injuries. Her testimony was accompanied by photographs of the victim before and during the autopsy, which showed extensive bruising all over the victim's body as well as internal injuries.

*Davis*, 2005 WL 1492216, at *2-3.

B. Petitioner's Trial Testimony

At trial, Petitioner testified that he was alone with his daughter Allison at about 3 p.m. when she lied about "messing in her pants" and attempted to hide the soiled clothes in her closet. (6 RR 117-19, 200.) He questioned her about why she did not use the toilet, but he did not get the answers he was looking for, so he told her to take a shower. (6 RR 120-21.) He testified that he knew it

would not be easy getting the answers he wanted out of her, so he got the plastic tube that he used for discipline. (6 RR 123.) It was a flexible PVC pipe about eighteen inches long and no bigger around than a penny. (6 RR 125.) Petitioner said he hid the tube behind his back, told her to shut off the shower, and asked her again why she did not use the restroom. (6 RR 123-24.) When he did not get the response he wanted, he told her she was in trouble for lying and ordered her to turn around and bend over. (6 RR 124.) He began hitting her with the PVC pipe on her bare buttocks, but she put her hand back there and refused to take the punishment. (6 RR 124, 126-27.)

Petitioner testified that he had previously explained to Allison that if she fights during punishment, punishment gets worse. (6 RR 127.) So he started "popping" her with the stick on the thigh, legs, and torso as she was turning around, from her knees up to her chest, to make her understand that he wanted her to stay in one place, take three swats, and be done with it. (6 RR 127-28.) He did this because he believed this was "that one disciplinary action" parents have to give children to make them understand that they should do what they are told. (6 RR 129.) Petitioner wanted to physically show Allison that it was better to take the three swats than continue to fight when she knows she is not supposed to. (6 RR 129.)

Petitioner said he was irritated but denied being mad or losing his cool. He said he stopped hitting Allison because he thought that she had had more than enough to get his point across. (6 RR 130.) He then spoke to Allison about why he did what he did and again tried to figure out why she did not use the bathroom. (6 RR 130-31.) She was not listening to him, so he "popped" her in the back with the back of his hand, explaining to the jury, "It's just a young child. To keep a child's attention is not that easy." (6 RR 131.) He told her to put on her shorts, and they played video games until 10 p.m. (6 RR 132-33.)

Petitioner testified that, at about 10:20 p.m., Allison went into the kitchen to get a drink. (6 RR 135.) When he checked on her ten minutes later, he found her sitting on a stool with her head on the counter and her hair in spilled Kool-Aid. (6 RR 135-36.). When she did not respond to his inquiries, he popped her with the back of his hand and patted her two times as she jerked around, his hand landing on her side. (6 RR 136-37.) He did not spank her anymore after that. (6 RR 137.) He instructed her to take another shower and patted her on the butt with his foot, fussing sarcastically about how much money he would have to pay for all the water she was using. (6 RR 138-39.)

Petitioner testified that he heard a clattering sound while she was in the shower. (6 RR 141.) He sneaked quietly to the bathroom figuring he would catch her in the act of doing something she was not supposed to be doing. (6 RR 142.) When he pulled the shower curtain back, she was pointing towards the faucet with her hand on top of her head. (6 RR 142-43.). She had a small, bleeding scratch on her head, so he rinsed it off and turned off the shower. (6 RR 143-44.) She did not cry or respond to his questions. (6 RR 143-44.) He told her to put her shorts back on and that it was time to go to bed. (6 RR 145.) This was at about 11 p.m. (6 RR 144.)

While lying in bed next to Petitioner watching television, Allison went rigid, her jaw locked, and her eyes pointed in different directions. (6 RR 145.) Petitioner testified that he thought she had a seizure and said she was not breathing and had no pulse. (6 RR 145.) He started CPR and called emergency services. (6 RR 145-46.) Petitioner said he continually gave CPR until Sergeant Williams arrived and stopped him from rendering aid. (6 RR 146-48.) Petitioner stated that nobody administered aid after that until the paramedics arrived. (6 RR 148-49.)

Petitioner denied reading his written statements before signing them, and he denied making certain statements contained in them. (6 RR 152-54, 156-61, 163, 165-75.) He said that the Sheriff

exaggerated Allison's injuries and that his emotional condition rendered his written statements involuntary. (6 RR 193-95.) Petitioner also denied having bruised or swollen knuckles. (6 RR 183.)

Petitioner testified he did not intend to kill Allison and denied hitting her with enough force to tear her heart. (6 RR 175-76.) Petitioner also said he was not aware that his conduct might cause a risk of injury or death. (6 RR 176.) Using a plastic spoon, he demonstrated the amount of force he used to discipline Allison. (6 RR 197.) Finally, the pants Petitioner wore on the night Allison died were admitted into evidence to show that he had defecated in his pants from shock when he realized that his daughter was not breathing. (6 RR 198-99.)

## III. Applicable Law

This habeas proceeding is subject to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under the AEDPA, a state court's adjudication of an issue on the merits is entitled to deference. *See Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

### A. Standard of Review

A federal court may grant relief under AEDPA only where the state court proceedings resulted in a decision that was (1) contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d); *see Rivera v. Quarterman*, 505 F.3d 349, 356 (5th Cir. 2007).

Section 2254(d)(1) of AEDPA concerns questions of law and mixed questions of law and fact. *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002). Under the "contrary to" clause in subsection (d)(1), a federal habeas court may grant the writ of habeas corpus if the state court arrived at a conclusion opposite to that reached by the United States Supreme Court on a question of law

or if the state court decided a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Id.* With respect to the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identified the correct governing legal principle but unreasonably applied that principle to the facts of the prisoner's case. *See id.* (citing *Williams v. Taylor*, 529 U.S. 362, 409 (2000)). Under *Williams,* a state court decision is unreasonable if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under section 2254(d)(2), federal courts give deference to the state court's findings unless they are "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000) (as modified on denial of reh'g). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

B.  Ineffective Assistance of Counsel

To sustain a claim of ineffective assistance, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so gravely as to deprive him of a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Judicial scrutiny of counsel's performance is highly deferential and every effort is made to eliminate the distorting effects of hindsight. *Id.* at 689. Courts, therefore, "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

If counsel's representation is proven deficient, a petitioner must next show prejudice, that is, "a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional errors." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 694). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694. The failure to prove either deficient performance or actual prejudice is fatal to an ineffective-assistance claim. *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

Under AEDPA standards, the question is not whether this Court believes the state court's determination under *Strickland* was incorrect but "whether that determination was unreasonable–a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Where, as here, the state court's decision is a summary one unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court's denial of relief. *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011). Further, because the *Strickland* standard is a general one, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (stating that, the more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations).

## IV. Claims of Eliciting False Testimony

In claims 1(a) through (f), Petitioner raises allegations of ineffective representation in the scope and content of trial counsel's cross-examination. Petition, pp. 13-18.

### A. Testimony that Petitioner Faked CPR

Petitioner first contends that counsel elicited false testimony from Forney Police Sergeant Mike Williams that Petitioner was faking CPR on his daughter when Williams arrived at Petitioner's

home.  The record shows that trial counsel was attempting to confirm Williams' direct testimony that he saw Petitioner perform CPR, (5 RR 134-35, 140), when Williams made the following reply:

> I seen him over her, he had one hand on her chest laying over her, but his head never come in contact with her.  He was probably two or three inches away from her mouth.  He never blew no air into that child's body. . . . I seen his hand go down for one compression and when he leaned forward like he would be blowing in her mouth, he never made contact with her mouth.  I didn't see her chest rise, also.  But he was not close to her mouth.

(5 RR 140-41.)

Faced with this answer, counsel proceeded to impeach Sergeant Williams' interpretation of Petitioner's actions by pointing out that Petitioner's act of pushing on the victim's chest and leaning over her was no different from Williams' description of his own act of CPR on direct examination.  (5 RR 143.)  Counsel also elicited testimony from another responding police officer who said that leaning over the victim while listening and feeling for breath is the first step of CPR, and he would not categorize it as faking CPR.  (5 RR 154-55.)

Initially, the Court notes that decisions regarding the extent and manner of cross-examination are strategic in nature and generally will not support an ineffective assistance claim.  *See Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002).  In an affidavit submitted to the state habeas court, trial counsel explained that he was attempting to show with his question that Petitioner was trying to save his daughter's life, and counsel believed he had sufficiently impeached Williams' subsequent testimony that Petitioner was faking CPR.  (SHR 33-34.)  The state habeas court concluded that counsel's decisions were sound strategy and that counsel showed Williams' testimony to be false, "as it more accurately reflected that [Petitioner] had just begun performing CPR." (SHR 94-95, 97.) The state court's application of *Strickland* was not unreasonable given the facts before it.

Alternatively, the state court reasonably concluded that Petitioner was not prejudiced by the alleged deficient cross-examination. (SHR 94-95, 97.) First, the jury received unambiguous evidence of Petitioner's attempts to resuscitate his daughter through a 9-1-1 recording in which Petitioner told the operator, "I'm performing CPR on my daughter right now" and testimony from the lead paramedic that dispatch had informed him that CPR was already in progress. (5 RR 44, 80-82.)

Second, to the extent counsel's elicitation of the simulation testimony deprived the jury of evidence from which to conclude that Petitioner did not intend to take Allison's life, as Petitioner contends, the probative force of that evidence would have been outweighed by the evidence of guilt. Petitioner testified that Allison was less than 4 feet tall and weighed 45 pounds, while Petitioner was 6'4" and about 230 pounds. (6 RR 176-77.) He testified they were home alone when he disciplined her with an eighteen-inch PVC pipe and with the back of his hand. (6 RR 115, 125-31, 137, 199-200.) Petitioner reported to 9-1-1 that his daughter had hit her head in the tub, but Sergeant Williams and paramedics testified that they observed injuries that were inconsistent with a fall in the bathtub, namely numerous and "extremely unusual" bruising across the chest, scratches, torn skin above the right knee, and fractured ribs on the left and right side. (5 RR 68-69, 75, 98-100, 104, 112, 121-23, 125.) Although Petitioner had been performing CPR on Allison, she had no pulse or blood pressure and was not breathing when the paramedics arrived. (5 RR 68, 83, 96.) The paramedics testified that their resuscitation attempts, including the administration of atropine and epinephrine, did not cause Allison's injuries or death. (5 RR 96, 98, 116, 125-28.)

A medical examiner testified that the child died from multiple blunt-force injuries. (6 RR 29.) Among the external injuries were bruises on the trunk consistent with being struck by a pipe, bruises on the face and chin, abrasions on the neck and back of the head, bruises on all sides of the

head, a broken tooth, a bruise on the labia, bruising on the buttocks and back of the left thigh consistent with a pipe, abrasions on the backs of the knees, and multiple areas of bruising on the arms and chest.  (6 RR 30-35, 45; SX 8.)  Internal injuries included hemorrhage on the brain, rib fractures, a tear in the septum of the heart, hemorrhage to the soft tissue under the liver, lacerations of the pancreas, blood in the abdomen and chest cavity, bruising to the lungs, and hemorrhaging around the spinal cord.  (6 RR 35-42, 45-46; SX 8.)  Trauma to the child's back was so severe that her skin was separated from the muscle.  (6 RR 44.)  The medical examiner testified that Allison's death was not caused by medical treatment, disease, or CPR.  (6 RR 37, 40, 49, 64-66.)  In addition to this, the jury considered two written statements made by Petitioner after arrest, one of which contains the admission that he "completely lost it" and whipped Allison with a plastic pipe and his closed fist.  (5 RR 173-78, 217-27.)

Evidence of Petitioner's size and strength relative to Allison, coupled with her severe, numerous, and varied injuries, are sufficient proof of the culpable mental state such that trial counsel's elicitation of the simulation testimony, if deficient, does not undermine confidence in the jury's verdict.  *See Estelle v. McGuire*, 502 U.S. 62, 69 (1991) (concluding that the evidence of prior injuries to a child, whether directly linked to defendant or not, was probative on the question of the intent with which the person who caused the injuries acted)*; Pondexter v. Quarterman,* 537 F.3d 511, 524 (5th Cir. 2008) (concluding there is no prejudice under *Strickland* where a jury, cognizant of the overwhelming evidence of guilt, would have found petitioner guilty despite the alleged deficiencies in counsel's representation); *Lindsey v. State*, 501 S.W.2d 647, 648 (Tex. Crim. App. 1973) (noting that the court must take into account the extent of the injuries and the relative size and strength of the parties when considering whether the whipping of a three year-old boy who defecated in his pants was administered with the intent to murder).  The state court's denial of relief was not

unreasonable.

B. Testimony of Blood in Petitioner's Home

Petitioner next contends that counsel rendered ineffective assistance when he knowingly questioned Sergeant Williams about seeing blood in Petitioner's home. Again, the record reflects that counsel did not intentionally elicit this information. Counsel questioned Sergeant Williams about whether he saw any vomit, other than the vomit next to where the child had been lying, in the house. (5 RR 139.) Sergeant Williams responded:

> Yes. There was vomit and blood in the–I believe it would be the east bathroom and then back toward the hallway, the west bathroom, there was blood and vomit there.

(5 RR 139.) Counsel abandoned this line of questioning, and the State did not pursue it on redirect examination. (5 RR 144-45.) Petitioner concedes there is no other evidence of blood in the home, as the State had no intention of offering any. (Petition, p. 14; 3 RR 103.) Other testimony indicated that the victim had a bleeding, quarter-inch sized cut on her head, which trial counsel was able to attribute to a possible fall in the shower. (5 RR 122-23, 163; 6 RR 59-60; SX 18.) During jury argument, neither party mentioned the presence of blood in the home. (7 RR 6-30.)

Williams' testimony about blood was not responsive to defense counsel's question about the presence of vomit. In this circumstance, a competent trial attorney might well forego an objection to the non-responsive answer in order to minimize the jury's attention to it. *See Hardamon v. United States*, 319 F.3d 943, 949 (7th Cir. 2003) (quoting *United States v. Payne*, 741 F.2d 887, 891 (7th Cir. 1984)). Thus, the state court could have reasonably denied relief based on a lack of deficient performance.

Alternatively, there is no prejudice. Petitioner argues that the testimony prejudiced him because it painted a gory picture of a bloody home and contradicted his testimony that he did not

brutally beat Allison to death. The record does not support Petitioner's characterization of this brief testimony as "gory." The isolated statement of "blood and vomit" near the bathrooms added little, if anything, to the prosecution's body of evidence. Therefore, assuming *arguendo* that counsel's cross-examination was deficient, it does not undermine the Court's confidence in the verdict. *See Pondexter*, 537 F.3d at 524 (finding no *Strickland* prejudice where a jury, cognizant of overwhelming evidence of guilt, would have found defendant guilty despite alleged deficient conduct). A lack of prejudice under *Strickland* is an alternative, reasonable basis for the state court's denial of relief on this issue.

### C. Testimony that Sergeant Williams Performed CPR

Petitioner contends trial counsel elicited and failed to rebut Sergeant Williams' false testimony that he performed CPR on Allison. Petitioner contends that if counsel had impeached Williams on this issue, the jury would have known that Williams stopped Petitioner from performing CPR and left Allison to die on the floor while he searched Petitioner's home.

The state, not defense counsel, first elicited testimony from Sergeant Williams that he performed CPR on Allison after moving Petitioner out of the way. (5 RR 135-36.) As previously noted, by showing that the two men performed substantially the same acts, defense counsel's decision to explore this subject with Williams on cross-examination was a successful impeachment of Williams' opinion that Petitioner faked CPR. (5 RR 143.)

Moreover, as Petitioner acknowledges, counsel elicited testimony from two responding paramedics who said they did not see anyone performing CPR on Allison when they arrived. (5 RR 78-79, 129.) Petitioner himself also testified that Williams did not administer first aid to Allison. (6 RR 147, 148-49.) Thus, counsel created a fact issue for the jury as to whether Williams had

performed CPR. Nevertheless, Petitioner contends that counsel should have cross-examined Williams regarding the contradictory testimony.

The decision not to confront Williams with the conflicting testimony of the paramedics was a reasonable trial strategy. It appears from the record that the paramedics did not see Williams perform CPR because Williams only did it for about a minute and a half and then, when Officer Ashcroft told him the paramedics had arrived, moved out of their way. (5 RR 136, 149, 153-54.) The State could have clarified this explanation through redirect examination of Williams, but unchallenged, the jury was able to draw the most favorable inferences from the testimonial conflicts that counsel created. Counsel's cross-examination strategy was within reasonable professional standards.

Alternatively, there is no prejudice. Petitioner argues that he was prejudiced by counsel's cross-examination strategy because, had counsel confronted Sergeant Williams directly on this issue, the jury would have known that Williams had left Allison without CPR for "8 to 10 minutes" and may have held him responsible for her "ultimate death." Petition, p. 15. There is no indication, however, that Williams would have changed his testimony under further cross-examination. The trial evidence conflicts with Petitioner's 8- to 10-minute time frame,[3] and Petitioner does not suggest, much less show, that Sergeant Williams was responsible for the injuries that caused Allison's death.

The state court's denial of relief was not an unreasonable application of *Strickland*. Counsel exhibited professional competence in (1) impeaching Williams' simulation testimony with Williams'

---

[3] Sergeant Williams arrived first, with Officer Ashcroft about 20 to 30 yards behind him. (5 RR 148-49.) Ashcroft retrieved a medical kit from his trunk while Williams entered the home, and when Ashcroft reached Petitioner's front door with the medical kit, he advised Williams that the ambulance had pulled into the driveway. (5 RR 149.) A paramedic on this ambulance confirmed that the police "arrived right ahead of us and then we all made entry in the house pretty much at the same time." (5 RR 103-04.)

own testimony about how he performed CPR and (2) eliciting conflicting evidence as to whether Williams performed CPR in the first place. Even if deficient, this trial strategy does not undermine the Court's confidence in the verdict. *See Pondexter*, 537 F.3d at 524.

D. Testimony that Allison Had Five Broken Ribs

Petitioner next contends that trial counsel elicited false testimony that Allison had five broken ribs at the time of her death. Petitioner contends this prejudiced him because Allison had only two fractured ribs, both of which could have been explained by a fall in the shower or by CPR.

The autopsy report indicates that Allison had two types of injuries to her ribs: (1) recent fractures, and (2) recent hemorrhaging of old, healed fractures ("woven bone" or "callous"). (6 RR 9-10, 17.) The trial court granted defense counsel's request to redact references to old injuries where it could be done without drawing attention to the omission, but the trial court did not redact combined references to old and new injuries. (6 RR 17-18.) As admitted before the jury, the autopsy report indicates Allison had recent hemorrhaging and old callous on right ribs 7, 10, and 11, and left rib 9, as well as the new fractures on left ribs 6 and 7. (SX 8, pp. 2, 5.)

On direct examination, the medical examiner explained the presence of blood in the right chest cavity as being caused by "blunt trauma, the rib fractures, and then it would bleed." (6 RR 41.) This testimony referenced hemorrhaging of old fractures on the right side. On cross-examination, the doctor reiterated that the right ribs 7, 10 and 11 were "broken" in addition to left 6 and 7, for a total of five. (6 RR 60-61.) This is the cross-examination of which Petitioner complains.

The cross-examination repeats substantially the same information contained in the autopsy report and the direct testimony. To the extent that trial counsel characterized the right ribs as "broken" rather than having old, healed fractures with recent hemorrhaging, this is a distinction

without much difference, and it may have even camouflaged the fact that Allison's ribs had been broken on a previous occasion. As trial counsel explained in his affidavit, the medical examiner's testimony "spoke of recent hemorrhages from all the rib injuries. Consequently, I was not in a position to overlook/disregard the hemorrhages to the 'old' broken ribs." (SHR 35.) The state court concluded that the medical examiner's testimony was confirmed by the autopsy report and not impeachable. (SHR 96, 98). This conclusion is supported by the record and not unreasonable.

Alternatively, the lack of prejudice is a reasonable basis to deny relief. Petitioner argues that the medical examiner's testimony is prejudicial when coupled with the prosecutor's statement during jury argument that the victim had seven broken ribs. In fact, the autopsy report supports the conclusion that Allison had six ribs with recent injuries (fractures or new hemorrhaging of old fractures): the left 6, 7 and 9 and the right 7, 10, and 11. (SX 8, pp. 2, 5). In any event, the victim's rib injuries were only a small portion of her injuries, the totality of which could not be explained by a fall in the shower or CPR. The Court is confident that the jury's verdict did not hinge on the prosecutor's assertion of seven as opposed to two or five rib fractures. *See Pondexter*, 537 F.3d at 524 (concluding that overwhelming evidence of guilt can support a finding of no prejudice).

### E. Testimony that the Heart Injury Could Have Been Caused by a Fist

Petitioner complains that trial counsel elicited testimony from the medical examiner that the injury to Allison's heart was consistent with being struck by a fist. Specifically, he complains that counsel began cross-examination regarding the heart injury with, "I think the question put to you by [the prosecutor] was, would that wound be consistent with having been caused by a fist?" to which the medical examiner replied, "It could be consistent, yes." (6 RR 64). Petitioner contends this harmed him because without it there would have been no connection between "a theory of the offense alleged in the indictment (hitting with a fist) and the fatal injury." Petition, p. 17.

This cross-examination was not the only connection between the heart injury and a blow from a fist. The medical examiner testified that multiple blunt force injuries caused the victim's death. (6 RR 29, 50). She testified that the heart injury specifically was caused by "blunt trauma" and not CPR. (6 RR 47, 49.) Petitioner's statements that he hit Allison with his closed fist were also in evidence. (SX 5, p. 2; SX 7, p. 4-5.) Thus, the jury heard testimony connecting the heart injury to blunt force trauma caused by Petitioner's fist, which defense counsel was not at liberty to ignore. Counsel's cross-examination of the medical examiner was an attempt to establish other innocent–or at least unintentional–causes for Allison's severe injuries. Given the circumstances, counsel was not deficient for beginning his cross-examination by acknowledging the evidence he needed to surmount.

Moreover, Petitioner's argument that trial counsel's cross-examination was the only proof connecting him to the fatal injury is not well-taken because the medical examiner testified that Allison may have died from the bruising alone, without the heart injury. (6 RR 51-53). The doctor also agreed that Allison's injuries were consistent with Petitioner's statement that he whipped her with a plastic pipe, which was an alternative manner and means alleged in the indictment. (6 RR 48; CR 4). Given the available alternative theory as to the cause of death, counsel's alleged deficiency in eliciting proof that Allison's heart injury was caused by a fist does not undermine confidence in the verdict nor show that Petitioner's trial was unfair. The state court's denial of relief was not an unreasonable application of *Strickland.*

F. <u>Testimony that Allison's Mother Intended to Take Allison Back to San Antonio</u>

Petitioner complains defense counsel elicited false testimony from Allison's mother, Rhonda Cook, that she spoke to Allison on the phone the day before she died and told Allison she was coming to take her back to San Antonio. Petitioner contends the testimony harmed him because it gave the jury evidence of a possible motive.

Rhonda Cook testified on direct examination that she spoke to Allison on the telephone the day before she died. (5 RR 30.) On cross-examination, trial counsel inquired into the content of this phone call. Cook testified that she told Allison that the summer was over, it was time for her to go to school, and that she would pick her up that weekend. (5 RR 34-35.) According to Cook, Allison responded, "Okay." (5 RR 35.) Trial counsel then inquired into the number of other telephone calls Cook made to Allison that summer, highlighting the fact that "everything went okay" with Allison living with Petitioner, that nothing caused Cook to think Allison was in danger or scared, and that Cook would have immediately picked her up if she thought otherwise. (5 RR 36.)

During his testimony on this subject, Petitioner stated that, although he and Cook originally agreed that Allison would live with him until August 1, the plans changed. (6 RR 112, 115.) According to Petitioner, they agreed that Allison should stay with him for the school year because Cook did not have a job, could not pay her bills, and had "some very emotional problems" and other things that Petitioner said he did not want to "get into." (6 RR 115-16.)

Counsel's cross-examination was not deficient. On the contrary, counsel elicited statements of the deceased child to her mother showing that she never expressed fear of her father. Counsel showed that Cook did not consider Petitioner to be a danger to Allison right up to the day before she died. Furthermore, Petitioner's version of the custody agreement contradicted Cook's but does not prove it to be false. *See Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (holding that contra-

dictory testimony merely establishes a credibility question for the jury, not perjury).

Alternatively, Petitioner's argument that the cross-examination prejudiced him because it provided a motive for Allison's murder is not persuasive. Petitioner testified that he disciplined Allison for lying about a bathroom accident. (6 RR 123-24, 136-37; SX 5, 7). The State accepted this asserted motive as true and argued that Petitioner intentionally "beat the tar" out of Allison after she defecated in her pants. (6 RR 28-29.). The State did not argue that Petitioner killed Allison in retaliation for Cook's plan to take her home. (6 RR 6-16, 26-30.) To the extent there was a factual dispute at trial, it concerned Petitioner's culpable mental state, not his motive. The severity and variety of Allison's injuries was the most persuasive evidence of the culpable mental state in this case. *See Estelle*, 502 U.S. at 69 (concluding that the evidence of prior injuries to a child, whether directly linked to defendant or not, was probative on the question of the intent with which the person who caused the injuries acted); *Lindsey*, 501 S.W.2d at 648 (noting that the extent of the injuries and the relative size and strength of the parties informs the determination of whether parental discipline was administered with the intent to murder).

Thus, the chance that the jury used Cook's testimony as evidence of Petitioner's motive rather than the motive propounded by both parties was minimal if not non-existent. Since motive was not a disputed fact and Petitioner has not proven that Cook's testimony was false in the first place, the record does not undermine this Court's confidence in the verdict nor show that Petitioner received an unfair trial. The state court's denial of relief was not unreasonable.

## V. Failure to Object to Voir Dire Examination and Jury Argument

In claims 2(a) through (g), Petitioner argues that counsel rendered ineffective assistance by failing to object to statements made by the prosecutor that: (a) incorrectly defined the culpable mental state for capital murder, (b) attributed to Petitioner the dissection caused by autopsy, (c, d)

inaccurately informed the jury that Allison had 300 bruises on her body and seven broken ribs, (e) inaccurately informed the jury that Petitioner "laid into" Allison for three hours, (f) falsely and violently demonstrated with his arm the force Petitioner used to beat Allison, and (g) called Petitioner a liar.  Petition, pp. 18-28.

A. <u>Definition of the Culpable Mental State</u>

Petitioner first complains that the prosecutor misstated the law when he informed the venire that a capital murder can be committed by a person intending to cause serious bodily injury and committing an act clearly dangerous to human life.  Petition, p. 18.  During jury selection, the prosecutor discussed the concept of lesser-included offenses and gave this definition as one possible definition of murder, not capital murder, that the jury might see in the court's charge.  (4 RR 26-27.)

As Petitioner correctly notes, this definition is found in Texas Penal Code section 19.02(b)(2).  *See* TEX. PENAL CODE ANN. § 19.02(b)(2) (defining murder as intending to cause serious bodily injury and committing an act clearly dangerous to human life that causes death).  The prosecutor's discussion of a hypothetical lesser-included offense was a proper way to qualify the jurors on their ability to consider the entire punishment range in the event Petitioner was found guilty of a lesser-included offense.  (4 RR 30-31.) *Cordova v. State*, 733 S.W.2d 175, 185 (Tex. Crim. App. 1987) (holding that prospective juror who could not consider the minimum punishment for the hypothetical lesser-included offense of murder is subject to removal for cause).  Thus, Petitioner's trial counsel had no legitimate basis for objecting to the portion of voir dire properly defining a hypothetical lesser-included offense of murder.

Within this first complaint, Petitioner contends the prosecutor's jury argument removed entirely the State's burden of proof as to the culpable mental state for capital murder.  Petition, p. 19.  The record does not support this allegation.  During jury argument, defense counsel argued that

Petitioner did not intend to kill his daughter and acted only negligently. (7 RR 25.) The prosecutor responded that he did not have to prove Petitioner had "intent to kill," but only that Petitioner intentionally or knowingly caused Allison's death. (7 RR 209.) This is a correct statement of the law. *See* TEX. PENAL CODE ANN. §§ 19.03(a)(8), 19.02(b)(1) (together defining capital murder as intentionally or knowingly causing the death of a person under six years of age). In other portions of jury argument, the prosecutor emphasized the State's burden of proof as well as the culpable mental state of intentionally or knowingly causing the death of an individual. (7 RR 8, 9, 10, 12). Trial counsel had no legitimate basis for an objection to these statements, as they contained a correct definition of the *mens rea* required for capital murder and corresponded with the jury charge in the case. (CR 205, 207, 208.) Counsel is not deficient for failing to lodge fruitless objections. *See Nixon v. Epps*, 405 F.3d 318, 328 (5th Cir. 2005).

B. <u>Prosecutor's Description of Injuries</u>

Petitioner complains that counsel did not object when the prosecutor informed the jury that Petitioner caused the mutilation of Allison's body as depicted in the autopsy photos. Petition, p. 19. This claim specifically refers to the prosecutor's statements that Petitioner treated his daughter "like a rag doll" and "just went to work on her, tore her body apart." Petitioner, p. 20. The trial court held a hearing outside the jury's presence to discuss the admissibility of the autopsy photographs. (6 RR 18-26.) After excluding some duplicate photos, the court overruled defense counsel's objection to the remaining photographs, stating that, while unpleasant, the photographs were relevant in light of the nature of the case, the allegations made, and the defensive cross-examination. (6 RR 25, 26.)

Permissible jury argument generally falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing

counsel; or (4) a plea for law enforcement. *Berry v. State*, 233 S.W.3d 847, 859 (Tex. Crim. App. 2007). The record does not support Petitioner's characterization of the prosecutor's argument as attributing the damage caused during autopsy to Petitioner. The prosecutor's argument that Petitioner treated his daughter "like a rag doll" and "just went to work on her, tore her body apart" was a proper summation of and a reasonable deduction from the severity of the injuries sustained by the victim. Furthermore, the jury saw pictures of how the body looked when it was received by the medical examiner and was informed of the dissection procedures as the autopsy progressed, such that the jury would not have confused the autopsy dissection with the injuries that caused her death. (6 RR 28, 33-46; SX 9, 10). The state court's denial of relief was a reasonable application of *Strickland*. *See Nixon*, 405 F.3d at 328.

## C. The Prosecutor's Injury Count

Petitioner contends that counsel should have objected to the prosecutor's statement that he counted 300 bruises on Allison's body and that Petitioner broke "at least seven" ribs. (7 RR 13.) In his affidavit for the state habeas proceeding, trial counsel explained, "Bruises on the body were evident–whether it was one or more. To object to the number actually specified by the prosecutor in his closing remarks would draw unnecessary attention to the fact that there were any bruises at all." (SHR 34.) Counsel did not specifically address his lack of an objection to the stated number of ribs broken, but the same rationale applies. The state habeas court concluded that counsel's decision not to object to the stated number of bruises and broken ribs was sound trial strategy designed to avoid drawing further attention to them. (SHR 95, 97.)

"A decision not to object during a closing argument is a matter of trial strategy." *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992). Defense counsel's decision here was a reasonable one under the circumstances. An objection to the number of bruises would have likely focused the jury's

23

attention on the innumerable bruises the child actually suffered.  Likewise, an objection to the number of broken ribs would have highlighted the multiple rib injuries and possibly the fact that some of the rib injuries were to previously healed, old fractures.  If anything, counsel's decision not to object, and thereby highlight the injury count, was a prudent one.  *See Nixon*, 405 F.3d at 328 (noting that decision not to highlight prosecutor's argument by objecting was  prudent).

    D. Length of Time Petitioner Beat Allison

Petitioner next complains of the following argument by the prosecutor:

I think he told ya'll he laid into that little girl for at least three hours.  Now, whether he meant to say that or not, I don't know, but that's what he said yesterday afternoon."

(7 RR 29).  His actual testimony, Petitioner argues, was that it had been three hours from the time his grandmother left his home at noon until the time he *started* to spank Allison at 3 p.m., not that he beat Allison for three hours.  (6 RR 178.)  Petitioner states he was harmed because the prosecutor misled the jury to believe he beat his daughter for three hours as opposed to spanking her for "a total of less than 15 seconds."  Petition, p. 24.

    Counsel's decision not object was within the wide range of reasonable professional assistance.  Petitioner admitted that he had disciplined Allison twice on the day she died, once at 3 p.m. and again around 10:30 p.m.  (SX 5, SX 7, 6 RR 117, 134-37.)  The prosecutor's admittedly unclear questioning on this issue asked "how long a period of time" did Petitioner "start" hitting Allison, after which Petitioner asked for clarification and then replied, "I'm guessing three hours." (6 RR 178.)  Like the testimonial exchange, the prosecutor's restatement of the testimony was equivocal, and it invited the jury to remember the testimony as they heard it.  As such, it was not outside the evidence.  Moreover, an objection, even if sustained, would have only reinforced what

the jurors had already been told: what the lawyers say is not evidence. (CR 211 ("You are the exclusive judge of the facts proved"); 7 RR 12 ("I can't tell you what the facts are, the defendant's attorney can't tell you what the facts are, and the judge can't tell you. It's up to you; you are the judges of the facts").)

Counsel's decision not to object under these circumstances was sound strategy in that an objection may have antagonized the jury by disputing a fact that was supported by the extensive physical injuries and, in the end, was not heavily relied on or emphasized by the prosecution. *See Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992) (noting that, in not objecting to prosecutor's reference to the brutality of the murder, defense attorney could reasonably have decided not to risk antagonizing the jury or that his best strategy was to let his own argument speak for itself).

E. Prosecutor's Demonstration

Petitioner next complains of argument made by the prosecutor while violently striking the ground with an object. The argument, as shown in the record, was:

> And you saw him yesterday, just (tapping plastic spoon). Huh-uh. You look. You look right here on Allie's chest and on her back. Is this those little, bitty love taps he was giving her? Huh-uh.
>
> What causes that? It's somebody weighing into her, just, wham (indicating). And that's this man, right here, weighing into that little girl.

(7 RR 30.)

During his testimony, Petitioner had used a plastic spoon to demonstrate, over the State's objection, the amount of force and the method he used to discipline his daughter. (6 RR 195-97.) He explained, "I started out with her rear, just like that, and as she began to turn around, just (tapping). Just like that. I can't–(tapping) that's pretty much all it was to it." (6 RR 197.) A

prosecutor's fair comments on the evidence are not objectionable. Defense counsel is not ineffective for failing to lodge a meritless objection. *See Nixon*, 405 F.3d at 328.

F. Calling Petitioner a Liar

Petitioner complains his counsel should have objected when the prosecutor called him a liar. Petitioner put his credibility in issue when he testified before the jury, and his testimony regarding the cause of Allison's injuries was contrary to the evidence of their character and number, which could not be explained by a few taps or a fall in the tub. (6 RR 30, 34, 37, 40-41, 48-50, 61, 64, 66, 120-37, 197.) Under cross-examination, Petitioner also denied signing written *Miranda* warnings until he was confronted with his prior sworn testimony to the contrary. (SX 4; 6 RR 181-83.) He further denied certain portions of his written statements, such as hitting Allison with a closed fist, hitting her in the stomach, "whipping her with a stick," and hitting her for the length of a minute. (6 RR 156-61.)

Petitioner having given testimony inconsistent with other evidence, including his own prior sworn statements, the argument that Petitioner is a liar was a reasonable deduction from the evidence and not improper. *See United States v. Loney*, 959 F.2d 1332, 1343 (5th Cir. 1992) (holding that it was not impermissible to call defendant a "liar" as long as the inference is grounded upon the evidence). Therefore, counsel was not ineffective for not objecting to it. *See Younger v. Cockrell*, No. 3:00-CV-2239-G, 2001 WL 1543842, at *17 (N.D. Tex. Nov. 2, 2001) (declining to find counsel ineffective for not objecting when prosecutor called defendant a liar because statement was based on conflicting evidence from which it could be inferred).

## VI.    Defense Counsel's Jury Argument

In claims 3(a) through (d), Petitioner asserts that counsel undermined his credibility and his defense during jury argument. Specifically, he complains of defense counsel's following concession: "I didn't ride in here on a load of potatoes. He went too far in the discipline of his child." (7 RR 24.) He complains that counsel conceded causation, called his written statements "confessions," and did not properly argue their inadmissibility. Petition, pp. 28-30. In related claim 5, Petitioner asserts that counsel abdicated his role by conceding Petitioner's guilt of criminally negligent homicide against Petitioner's wishes. Petition, p. 36.

In claims 4(a) through (i), Petitioner points out the following alleged deficiencies in counsel's jury argument: (a) failure to humanize Petitioner and argue what type of person Petitioner "really was," (b) failure to point out that Petitioner called 9-1-1 and did not abandon his daughter, (c) failure to argue that Petitioner tried to save her life by performing CPR, (d) failure to argue that Petitioner did not flee the scene and was cooperative with the police, (e) failure to argue that Petitioner performed CPR for up to twenty minutes while waiting for emergency services to arrive, (f) failure to emphasize that Sergeant Williams prevented Petitioner from performing CPR, lied about performing CPR himself, and left Allison to die on the floor, (g) failure to emphasize that paramedics overdosed Allison with atropine and epinephrine, which could have caused the heart injury, (h) failure to emphasize that Allison had injuries at the time of autopsy that no one testified to seeing on Allison at the scene, and (i) failure to emphasize why the jury should not consider Petitioner's written statements, caused by counsel's additional failure to have the tape recording of his first statement "amplified" so that it could be heard. Petition, pp. 31-35.

A. Claims that Are "A Matter of Degrees"

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, reconstruct the circumstances of the challenged conduct, and evaluate the conduct from counsel's perspective at the time. *See Strickland*, 466 U.S. at 689. Courts must be "particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000)).

The following arguments asserted by Petitioner fall into the category of arguments that essentially come down to a matter of degrees: failure to humanize Petitioner and argue what type of person he "really was," failure to point out that Petitioner called 9-1-1 and did not abandon his daughter, failure to argue that Petitioner tried to save her life by performing CPR for up to twenty minutes, failure to argue that Petitioner did not flee the scene and was cooperative with the police, failure to properly argue the inadmissibility of the written statements, and calling the written statements "confessions."

Counsel did not overlook these issues. On the contrary, counsel elicited testimony from witnesses who said that Petitioner was not a violent person (6 RR 75, 89, 97), that Petitioner and his daughter seemed happy together (6 RR 84), and that they had never seen Petitioner inflict violence on his daughter. (6 RR 84.) Under cross-examination, Petitioner testified that he was "trying not to lose [his] nerve and just crawl into a fetal position and cry the rest of the day," and was "trying to keep [himself] together." (6 RR 179-80.) Counsel elicited testimony from Petitioner that he defecated from shock when he realized Allison was not breathing. (6 RR 198.) Counsel also elicited testimony from Allison's mother that she spoke to Allison at least two or three times a week

28

while Allison was in Petitioner's care, and, as far as she could tell, "everything went okay with Allison being with" Petitioner. (5 RR 35-36.)

It was an undisputed fact that Petitioner called 9-1-1. (5 RR 44.) Counsel elicited testimony that Petitioner performed CPR, and he informed the jury, through his cross-examination questions, that there was an unavailable five- to fifteen-minute 9-1-1 call that reflected Petitioner receiving CPR instructions from ETMS. (5 RR 54-55, 57-58, 80, 82.) Under counsel's examination, Captain Starkes volunteered that Petitioner was "pretty cooperative, yes, sir," and Petitioner described his emotional state during law enforcement interviews as extremely emotional, hyperventilating, and crying. (5 RR 191; 6 RR 193.)

Counsel conducted considerable cross-examination attempting to show the written statements to law enforcement were unreliable based on, among other things, the partial and inaudible tape recording. (5 RR 179-94, 202-05, 229-43.) The topic of the audiotape was explored during pretrial hearings, and the trial court deferred ruling on counsel's motion to suppress until counsel had the opportunity to listen to the tape. (2 RR 34-36, 134, 151.) Counsel had an agreement with the prosecutor that there would be "no problem" using the tape on cross-examination if there were discrepancies between the tape and the written statements. (2 RR 34.) Counsel successfully moved to have Petitioner brought to the courthouse to personally listen to the tape. (CR 134.) At trial, counsel questioned Captain Starkes about the poor quality of the recorder and the incompleteness of the tape due to the recorder shutting off automatically during the interview. (5 RR 184-88.) Counsel spent about half of his jury argument addressing the involuntariness of the written statements. (7 RR 17-22.) During this argument, counsel referred to the statements repeatedly as "statements," and only used the word "confession" when directing the jury to the appropriate portion of the court's charge, which used the terms "confessions or statements." (CR 207; 7 RR 17-22.)

Because the record indicates counsel was aware of these issues and pursued them, this Court will not second-guess counsel's decisions as to which facts or terminology to emphasize during jury argument. The state court's denial of relief was not unreasonable. *See United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) (rejecting *Strickland* claims regarding, among other things, the efficacy of counsel's closing argument where claims essentially came down to a matter of degrees).

B. Claims Contradicted by the Evidence

Petitioner next claims that counsel should have emphasized that there were scratches on Allison's neck at the time of autopsy that no one testified to seeing on her body at the scene and that paramedics overdosed Allison on atropine and epinephrine.

Petitioner's claim that Allison had scratches at the time of autopsy that no one saw at the scene is contradicted by the testimony of paramedic Bradley Gathright, who said he observed scratches on Allison, among other injuries. (5 RR 69.) Furthermore, the paramedics testified under cross-examination that Allison was given more than the standard pediatric dose of epinephrine and atropine, which was medically allowable under the circumstances and that, in any event, an overdose of these naturally-occurring compounds would not cause cardiac arrest. (5 RR 91-94, 116.) The medical examiner likewise testified that Allison's death was not caused by medical treatment measures or CPR. (6 RR 37, 49, 66.)

An argument that Allison had scratches not observed at the scene or was overdosed by paramedics would have been outside the evidence and improper. *See Berry*, 233 S.W.3d at 859 (describing four areas of proper argument). Further, counsel's failure to make an argument that contradicts the evidence is not error because Petitioner cannot show prejudice. *See Byrd v. Smith*, No. 93-6939, 1995 WL 8928, at *4 (4th Cir. Jan. 11, 1995) (holding that counsel's failure to make

an argument unsupported by the trial evidence is not error). Therefore, the state court's denial of habeas relief was not unreasonable.

    C. <u>Disagreement with Counsel's Strategy</u>

Petitioner argues that counsel should not have conceded that Petitioner "went too far in the discipline of his child," but should have emphasized that Sergeant Williams caused Allison's death by preventing Petitioner from performing CPR. He equates counsel's "unauthorized" strategy to concede guilt of the lesser-included offense of criminally negligent homicide with an unauthorized guilty plea and the abdication of counsel's role as advocate. Petition, pp. 28, 36.

The Sixth Amendment does not require counsel to do what is impossible or unethical, and if there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade. *See United States v. Cronic*, 466 U.S. 648, 657 n.19 (citing *Nickols v. Gagnon*, 454 F.2d 467, 472 (7th Cir. 1971)). Moreover, the appropriate inquiry under *Strickland* focuses on the adversarial process, not on the accused's relationship with his lawyer as such. *Cronic*, 466 U.S. at 657 n.21. If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance, and courts therefore attach no weight to either the client's expression of satisfaction with counsel's performance at the time of his trial or to his later expression of dissatisfaction. *See id.* (citing *Jones v. Barnes*, 463 U.S. 745 (1983); *Morris v. Slappy*, 461 U.S. 1 (1983)).

Petitioner incorrectly equates counsel's concession during jury argument with an unauthorized guilty plea. *See Florida v. Nixon*, 543 U.S. 175, 188-91 (2004) (holding that counsel's concession of guilt of the charged offense during jury argument in a death penalty case is not the functional equivalent of a guilty plea, which would require a client's express consent). Where, as here, counsel has conceded guilt of a lesser-included offense, Petitioner simply bears the burden to

prove that this decision was objectively unreasonable under *Strickland*. *McNeill v. Polk*, 476 F.3d 206, 217 (4th Cir. 2007).

Moreover, where Petitioner complains counsel failed to raise specific defenses, he must satisfy the prejudice prong of *Strickland* by showing some merit to the proposed defenses. *See Neal v. Cain*, 141 F.3d 207, 214-15 (5th Cir. 1998) (holding that petitioner's complaints regarding counsel's failure to raise specific defenses did not satisfy prejudice prong of *Strickland* where proposed defenses were without merit). Consistent with the *Strickland* standard of giving great weight to trial counsel's judgment on strategy and approach, "[t]actical decisions, made on an informed and reasoned basis, do not fall below *Strickland* standards simply because they do not succeed as planned." *Jones v. Butler*, 837 F.2d 691, 693-94 (5th Cir. 1988).

Counsel in this case was faced with a client whose five year-old daughter had died from extreme blunt force injuries sustained while in her father's sole care. Petitioner signed two statements admitting to beating and whipping his daughter with a PVC pipe, which corroborated the physical evidence (including unusually patterned bruising) and survived a motion to suppress. (2 RR 5-151; CR 129-33 (findings and conclusions on motion to suppress).) Counsel relitigated the admissibility at trial, and the jurors were charged not to consider the statements unless they believed the statements were freely and voluntarily made "without compulsion or persuasion." (2 RR 5-151; CR 207.) Petitioner's live testimony, in which he disavowed the more incriminating portions of his written statements and denied using the force necessary to cause the severe injuries his daughter suffered, nonetheless confirmed that he was alone with his daughter on the day she died (6 RR 200) and demonstrated his belief that physical discipline with an eighteen-inch PVC pipe was an acceptable part of child rearing that he had used "once or twice before" (6 RR 123).

With apparent complacency, Petitioner volunteered how he had hidden a PVC pipe behind his back when he first approached Allison for answers and told the jury that he later sneaked across a squeaky floor into the bathroom, hoping to catch her misbehaving. (6 RR 123-28, 142.) He admitted that he hit his unclothed five year-old with the PVC pipe, from knees to chest, front and back, "all the way around," because she could not satisfactorily answer Petitioner's inquiry about why she did not use the toilet. (6 RR 123-28.) He readily offered his belief that, if she refuses to take three swats, "the punishment gets worse." (6 RR 127.) He intended to give Allison that "one disciplinary action that your parents give to you to make you understand that–that you do what they say." (6 RR 129.) When offered an opportunity to explain how Allison's skin became separated from her back muscle or how she received the numerous bruises, Petitioner simply denied listening to the testimony about the injuries and denied seeing bruises. (6 RR 179-80.) There is no suggestion in this record, and Petitioner does not now contend, that someone other than Petitioner caused the myriad blunt-force injuries that caused Allison's death.

Counsel successfully excluded from Petitioner's second written statement and the autopsy report significant evidence of his prior abuse of Allison (5 RR 219-221; 6 RR 13-14, 17, 26; 8 RR 69). As such, it was a reasonable strategy to challenge the proof of the culpable mental state required for capital murder in the hope that the jury believed Petitioner's actions were the unintended consequences of a singular act of excessive parental discipline. In this vein, counsel did not concede guilt of the charged offense, but conceded culpability for the state jail felony of criminally negligent homicide and then precluded the prosecutor from telling the jury the lower punishment range for that offense. (7 RR 4.) Given the evidence, counsel could not credibly deny Petitioner's involvement in Allison's death, and his concession created no additional risk to Petitioner. On the contrary, it had the potential of winning the jury's confidence and thereby

obtaining a significantly lower punishment than the automatic life sentence that Petitioner faced for capital murder. That counsel's strategy was unsuccessful does not make it unreasonable or incompetent. *Jones*, 837 F.2d at 693-94.

Petitioner offers little more than his displeasure with the trial outcome to support his claims. The state court's ruling as to the competence of counsel's strategy was not an unreasonable application of *Strickland*. *See Haynes v. Cain*, 298 F.3d 375, 381-82 (5th Cir. 2002) (finding no violation of *Strickland* where counsel, without his client's consent, acknowledged that the evidence of guilt of a lesser-included offense was overwhelming); *Green v. Lynaugh*, 868 F.2d 176, 177 (5th Cir. 1989) (noting that ineffective assistance claim must fail if the facts point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal).

## VII.    The ETMS 9-1-1 Tape

Petitioner next addresses counsel's failure to obtain the complete recording of Petitioner's 9-1-1 call.

### A. Facts about the Existence of the ETMS Tape

On March 6, 2000, counsel filed a motion to preserve and produce tapes of the 9-1-1 call between Petitioner and law enforcement authorities. Counsel specified:

> The cassette tapes that were earlier given to the Defendant's Attorney are an abbreviated version of the actual call. Movant requests the entire tape which reveal[s] a longer time sequence.

(CR 144.) There is no ruling on this motion apparent in the record, but at the pretrial hearing held on April 3, 2000, counsel questioned Sergeant Williams regarding the existence of a 9-1-1 recording. Williams replied that if there was a 9-1-1 call, it would go through the Kaufman County dispatcher. (3 RR 69-70.)

At trial, the State admitted a short 9-1-1 tape recording through Kaufman County Sheriff Dispatch Supervisor Brenda Zepeda. (5 RR 42.) She explained that the tape was a copy of an original tape that should have been recorded by her computer's hard drive, but she had had problems with the hard drive during a three-week period of time. (5 RR 42, 56-57.) She said there were four days that she could not pick up on the original tape and that the original tape was currently at an archive recovery service. (5 RR 41-42.) She believed that the short tape she brought to trial was recorded from her computer's memory, which stores up to three weeks' worth of calls. (5 RR 57.)

On the tape heard by the jury, Petitioner tells the 9-1-1 operator, "I'm performing CPR on my daughter right now" and explains that his daughter fell in the tub and hit her head and is not responding. (5 RR 44.) He tells the operator, "Get me an ambulance out here." (5 RR 44.) The recording stops after the operator transferred Petitioner to ETMS for medical assistance in performing CPR. (5 RR 51-52.)

Defense counsel clarified through cross-examination that the 9-1-1 call to the Kaufman County Sheriff does not reflect the time Petitioner spent on the telephone with ETMS. (5 RR 53.) When counsel asked Zepeda if she had a recording of the call between Petitioner and ETMS, she replied, "At this time I do not. . . . I have had it. The [original] tape that I have, I sent to an archive recovery to see if indeed it was ever on that tape." (5 RR 58.) Defense counsel confirmed, "So, if that conversation between East Texas Medical and Cody Davis lasted five or ten or fifteen minutes, you don't know one way or the other," to which Zepeda replied, "Right." (5 RR 58.) When asked whether ETMS recorded the ETMS portion of the 9-1-1 call, Zepeda told defense counsel, "I'm sure they have a recording system just like we do, but I don't know what their policy is on retaining their recordings." (5 RR 57-58.)

B. The ETMS Transcript

35

Respondent does not dispute that attached to Petitioner's state habeas petition is a transcript of the ETMS portion of the 9-1-1 call, which Petitioner obtained from ETMS legal counsel after trial. (SHR 377-78, 400-412.) In the transcript, Petitioner tells the operator that his daughter has no heart beat and is not breathing. (SHR 401.) He asks the operator to hurry. (SHR 402.) He says his daughter hit her head in the tub but was talking and "all right" for the last thirty minutes. (SHR 401, 403.) Then, all of a sudden, her eyes "just went still" and she stopped breathing. (SHR 403-04.) Petitioner elaborates, "She said her head was hurting. And then she lays down . . . She just sat down watching . . . ." (SHR 407.) Hearing a "water sound" when Petitioner breathed into his daughter, the operator instructs him to clear vomit out of her mouth and throat, which Petitioner did periodically. (SHR 404-409.) When asked, he tells the operator his daughter does not have any kind of seizure disorder. (SHR 408.) At one point, Petitioner says, "Girl, whatever you got in you. Come on now, baby girl. Come on. You got to–come on." (SHR 409.)

Despite Petitioner's efforts, the transcript reflects that Allison did not regain a pulse. (SHR 408-09.) The operator apparently stays on the line until Sergeant Williams and the ambulance arrive. (SHR 410-11.) Sergeant Williams asks, "What happen to the kid?" and Petitioner replies that she fell over in the tub and hit her neck and head. (SHR 411.) Williams tells Petitioner, "Watch out. Back up. Back up. Get away. Get Back. Go. Come on." (SHR 411.) Petitioner says, "All right," and then confirms to the operator that the ambulance has arrived. She tells Petitioner, "Okay, sir. You did a real good job." (SHR 411.)

### C. Counsel's Performance

Petitioner claims counsel was ineffective for failing to obtain the ETMS tape. As noted, counsel moved to have the State preserve and produce a copy of the complete 9-1-1 tape before trial and inquired about its existence during a pretrial hearing. At trial, Zepeda indicated that the tape

did not exist but she was attempting to have it recovered. As such, counsel was not ineffective for failing to investigate the existence of the ETMS tape. *See Brogdon v. Blackburn*, 790 F.2d 1164, 1169 (5th Cir. 1986) (per curiam) (declining to find counsel ineffective for failing to investigate existence of a blood-alcohol test where counsel requested blood-alcohol test results and prosecution indicated there were no results to turn over).

D. Prosecutor's Duty to Disclose

Petitioner also contends that the State suppressed the 9-1-1 recording in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Under *Brady*, the State has a duty to disclose evidence favorable to an accused that is material either to guilt or to punishment. *See id.* at 87. But the prosecution has no duty to turn over evidence that is not in its possession or not known to exist. *See United States v. Edwards*, 442 F.3d 258, 266 (5th Cir. 2006). The Sheriff's 9-1-1 supervisor did not know if the tape existed at the time of trial and was in the process of attempting to have it recovered. Thus, the prosecution had no duty to disclose the Sheriff's recording of the ETMS portion of the 9-1-1 call.

It appears from the record, however, that ETMS had its own separate recording of their portion of the call, but Zepeda did not know if it had been retained by ETMS. Whether ETMS can be considered a part of the prosecution team such that their knowledge of the tape's existence would be imputed to the State under *Brady* is not clear from the existing record. *See Avila v. Quarterman*, 560 F.3d 299, 307-08 (5th Cir. 2009) (recognizing that knowledge held by a member of the prosecution team is imputed to the state for *Brady* purposes, and the issue of whether a person is a member of the prosecution team is determined on a case-by-case analysis). But the Court need not reach this question because a lack of materiality and prejudice are reasonable grounds to deny both the *Strickland* claim and the *Brady* claim.

E. No Prejudice or Materiality

The standard for prejudice under *Strickland* is identical to the standard for materiality under *Brady*. *Felder v. Johnson*, 180 F.3d 206, 214 (5th Cir. 1999); *see Strickland*, 466 U.S. at 694. The materiality inquiry asks whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Johnson v. Scott*, 68 F.3d 106, 110 (5th Cir. 1995). This inquiry depends almost entirely on the value of the *Brady* material relative to the other evidence mustered by the State. *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990), *vacated*, 503 U.S. 930 (1992), *abrogated on other grounds*, *Stringer v. Black*, 503 U.S. 222 (1992). The materiality inquiry is "a fact-intensive examination done on a careful, case-by-case basis." *Banks v. Thaler*, 583 F.3d 295, 322 (5th Cir. 2009).

Petitioner argues that his extensive efforts to save his daughter's life which are apparent in the ETMS recording could be interpreted by a factfinder as inconsistent with an intent to take her life. Resuscitation efforts can be equally consistent, however, with an effort to ameliorate the consequences of prior conduct that was intentional when it was originally carried out. Moreover, a decision to give first aid is not inconsistent with being aware that prior conduct was reasonably certain to cause death, an alternative culpable mental state alleged in this case. (CR 4, 205, 208.)

Petitioner also asserts that the recording contradicts Sergeant Williams' testimony that Petitioner was faking CPR by not breathing into Allison's mouth. Counsel sufficiently impeached Sergeant Williams on this point, however. Moreover, Williams was one of five "first responders" who testified at trial, and his testimony was not determinative of Petitioner's guilt.[4]

Portions of the ETMS transcript also contradict Petitioner's defensive testimony. For example, it shows that despite Petitioner's efforts, Allison was not breathing and had no pulse when

---

[4] Besides Sergeant Williams, the first responders who testified were Officer Ashcroft and paramedics Gathright, Barron, and Porter. (3 RR 47; 5 RR 63, 101, 117, 145.)

Williams arrived and thereby undermines Petitioner's attempts to show her death was caused by the acts of Williams. The tape suggests Petitioner perceived nothing inappropriate in Williams' behavior and undermines his claim that Williams had left Allison to die on the floor. Also, Petitioner's statements to the operator indicate that thirty minutes had elapsed between the time Allison fell in the tub and when she stopped responding. According to Petitioner's trial evidence, however, Allison showered at 10:30 and he called 9-1-1 at about 12:21 a.m. (DX 1; 5 RR 48, 50-51; 6 RR 135-41, 144.) Thus, Petitioner's explanation to ETMS did not account for a significant amount of time between the claimed fall in the tub and the 9-1-1 call.

Most significant is the fact that the transcript has no bearing whatsoever on the causes of the myriad injuries that led to Allison's death, except to emphasize that Allison was very near death if not dead by the time authorities arrived. Even with this tape, the jury would have had no alternative explanation for Allison's broken tooth, broken ribs, the tear in her heart, the countless bruises, or the separation of her skin from her back muscle. To the extent it supports his claim that he attempted to revive Allison and reflects an emotional state appropriate to the circumstances, the 9-1-1 tape that was admitted into evidence contained the same information (5 RR 44), albeit in abbreviated format, as did the testimony of the lead paramedic who said dispatch had advised that CPR was in progress (5 RR 81).

For all these reasons, the ETMS tape cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. The state court's denial of relief was not an unreasonable application of federal law. *See United States v. Miller*, 520 F.3d 504, 515 (5th Cir. 2008) (finding no *Brady* violation where, among other things, there was a substantial body of evidence establishing guilt that was left unscathed by the suppressed evidence); *Spence v. Johnson*,

80 F.3d 989, 995 (5th Cir. 1996) (noting that when the undisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs).

## VIII. The Totality of the Representation and Cumulation of Alleged Errors

Finally, Petitioner challenges trial counsel's representation in its totality and asks this Court to cumulate counsel's errors. Petition, p. 12. Counsel was appointed to represent Petitioner on September 1, 1999 and treated this case as a potential death penalty case. (CR 6, 32.) Counsel filed thirty-eight pretrial motions pertaining to the validity of the indictment, the method of jury selection, discovery, sentencing, notice of extraneous acts, and the constitutionality of penal code section 19.03, as well as motions in limine. (CR 9-195.) Counsel obtained an investigator on October 18, 1999 (CR 8), secured a mental status examination of Petitioner (CR 30, 138, 157; 2 RR 4), moved to preserve and produce the entire 9-1-1 recording (not the abbreviated version admitted at trial) (CR 144), received $315 to interview the medical examiner who performed the autopsy before trial (CR 135, 140; RR1(supp.) 7), obtained permission for Petitioner to have access to a videotape of the crime scene, recordings of his written statements to police, and recordings of his telephone calls with Rhonda Cook (CR 134, 136; RR1(supp.) 4), obtained any jail records relating to the length of Petitioner's 9-1-1 call (CR 194), and obtained access to Allison's hospital records without a subpoena (CR 155-56). Counsel successfully challenged ten potential jurors for cause. (4 RR 84-97.)

Counsel participated in live hearings on a motion to suppress statements, a motion to suppress physical evidence, and a motion to change venue. (2 RR 5-151; 3 RR 5-39, 45-105.) Counsel's efforts resulted in the suppression of significant crime scene evidence, including a PVC pipe found in the kitchen and hairs found lodged in cracks in the tub and kitchen cabinet door. (3 RR 92-93, 105.) Later, counsel convinced the trial court to redact portions of Petitioner's second

written statement that referred to prior incidents of abuse where he had pushed Allison's head into the commode because she had vomited after eating his spicy food and where he picked her up by the arms and knocked a hole in the kitchen cabinet with the back of her head. (8 RR 69.) Likewise, counsel convinced the court to redact some references to healed fractures in the autopsy report. (6 RR 13-14, 17, 26.) Counsel successfully excluded Petitioner's statement, "I whipped her with a stick," made to a paramedic who had asked Petitioner what he did to his daughter. (5 RR 106, 110.) Moreover, although there were no eyewitnesses to the discipline that Petitioner administered on the day Allison died, defense counsel presented testimony about Petitioner's happy relationship with Allison and his character for non-violence from Petitioner's grandmother and three acquaintances. (6 RR 75, 84-85, 89, 97.) Counsel also preserved by objection a challenge to the statute that prohibited a sudden passion instruction in the charge. (6 RR 202-03.)

Counsel's representation exceeds the constitutional requirements of reasonable professional competence under the circumstances, and the accumulation argument fails because ineffective assistance cannot be created from the accumulation of acceptable decisions and actions. *See United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006). The state habeas court's rulings on these claims were neither contrary to nor involved an unreasonable application of clearly established federal law and were not based on an unreasonable determination of the facts in light of the evidence presented.

## **RECOMMENDATION**

This Court recommends that the petition for writ of habeas corpus pursuant to 28 U.S.C. §

2254 be DENIED.

Signed this 24th day of May, 2011.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO OBJECT

The United States District Clerk shall serve a copy of these findings and recommendations on the parties. Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to these findings and recommendations must file and serve written objections within fourteen (14) days after being served with a copy. A party filing objections must specifically identify those findings and recommendations to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. The failure to file such written objections to these proposed findings and recommendations shall bar that party from a *de novo* determination by the district court. *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985). Additionally, the failure to file written objections to proposed findings and recommendations within fourteen (14) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).